# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

_____

BRANDY KIMBREL, Individually,
as Next Friend for A.M., and Others
Similarly Situated; SINQUAY
SANDERS, Individually and for
Others Similarly Situated; and
ANIYSHA SANDERS, Individually,
and for Others Similarly Situated.


      Plaintiffs.                                                          Case No.:


v.                                                                                    Hon. Judge Hala Y. Jarbou

CITY OF GRAND RAPIDS; OFFICER
AUSTIN LYNEMA, Individually
and in his official capacity; OFFICER
BRANDON PLASTERER, Individually
and in his official capacity; OFFICER
THEODORE VANVLIET, Individually
and in his official capacity.
      Defendants.

_____

John R. Beason III, Esq.

The J.R. Beason Firm PLLC.

Attorney for the Plaintiffs

(269) 213-1426

JRBeason3@TheJRBeasonFirm.com

(1)

## **PLAINTIFF'S FIRST AMENDED COMPLAINT AND REQUEST FOR DAMAGES**

Plaintiffs, Brandy Kimbrel, A.M, Sinquay Sanders, and Aniysha Sanders, comes now, through counsel, and brings this action for violations of the Fourth and Fourteenth Amendments via an unreasonable seizure and the excessive force used to effect it. Defendants the City of Grand Rapids, Officers Austin Lynema, Brandon Plasterer, and Theodore Vanvliet, in their individual and official capacities, acted pursuant to the City's custom of Fourteenth Amendment equal protection and due process clause violations when they seized the Plaintiffs without probable cause, indifferently used unneeded excessive force, and falsified police incident report records to excuse and cover-up the unconstitutional seizure.  The Plaintiffs allege as follows:

(2)

## **INTRODUCTION**

This is a Civil Action asserting claims under the Federal Constitution, the Civil Rights Act of 1964, and substantiating violations of U.S. Const. amend. IV, U.S.

Const. amend. XIV,  42 U.S.C. § 2000d, 42 U.S.C. §1981(c), 42 U.S.C. § 1985, 42 U.S.C. § 1986, 42 U.S.C. §1983.

(3)

<b><u>JURISDICTION AND VENUE</u></b>

This court has jurisdiction over all causes of action set forth in this complaint pursuant to 28 U.S.C § 139, as the plaintiffs and the Defendants reside in the County of Kent, in the State of Michigan. The occurrence of the significant and relevant incidents giving rise to this complaint took place in Grand Rapids, MI, County of Kent, within the jurisdiction of this Court.

(4)

<b><u>THE PARTIES</u></b>

Plaintiffs are citizens of the State of Michigan and reside in the City of Grand Rapids in the County of Kent.

(5)

Defendants, Officers Austin Lynema, Brandon Plasterer, and Theodore Vanvliet are citizens of the State of Michigan with the competency and capacity to sue and be sued.  At the time of the alleged unconstitutional conduct, the Defendants were

employees and or residents in Grand Rapids, MI (Kent County) and currently retains domicile and residences in the District of Western Michigan.    The Defendant City of Grand Rapids, through its police department, is a municipal corporation department operating within the County of Kent in the Western District of the State of Michigan.

(6)

**FACTS GIVING RISE TO PLAINTIFF'S COMPLAINT**

On April 6th of 2022, the Plaintiffs, Mr. Sinquay Sanders, Aniysha Sanders, and their infant sibling A.M. traveled from their home to the nearest McDonald's to get a late night snack.    After getting their meals, they proceeded back home.

(7)

The Sanders Plaintiffs, both in their late teens at the time, were driving down Alexander St. going towards their home on Prince St. when they saw the Defendant Officers sitting parked.    The Plaintiffs passed by the officers as they approached the stop sign.    The Plaintiffs assert that as they passed the Defendants, they noticed that they were engaged and focused on another vehicle, but when they saw them coming by, they turned their attention to young Black American teens

who had committed any traffic violations by passing by.  The Plaintiffs assert they received the attention of the Defendants due to being young Black Americans and the color and make of their car; an orange Dodge Charger, popular with young minorities.  The modern versions of Dodge Chargers and Challengers are cult favorites within the Hip-hop and Chicano/Latino car communities and have been emblematic of minority youth culture for years.  After passing the Officers and noticing them watching their orange Dodge Charger, the Plaintiffs made a complete stop, looked both ways at the intersection, and continued towards their home.  Shortly after passing the officers, Defendants Lynema and Plasterer rushed behind the Plaintiffs and turned their lights on just as they were turning from the second stop sign at Prince and Alexander Streets, where they made another complete stop, and then turned on to their home street.  The Plaintiffs stopped in front of their home, a couple of houses from the interaction, when officers seized them without cause.

(8)

A few months before the Plaintiffs' April 6th, 2022 seizure incident, Grand Rapids Police Officers pursued the wrong suspect after failing to attempt to identify him as the actual suspect, and "accidentally" shot at his head as he fled from the

unannounced GRPD officers.   After nearly killing an innocent Black American man who had done nothing, another Grand Rapids police officer engaged an African immigrant to investigate a minor civil infraction, but used his discretionary police-powers to attempt to seize him and ultimately shoot him in the back of the head in broad-daylight, sending shockwaves through the community and nation. The regular incidents of dangerous recklessness culminating in an avoidable daytime killing by Grand Rapids police in 2022, began to climax after a policing bias study showed that Black Americans in Grand Rapids were twice as likely to be pulled over and seized in the metro city area than their Caucasian counterparts. That study further showed that the statistical data was trending worse as the years went on.   The study was released in 2017. (See Exhibit A).   Because Black Americans, especially teens and young adults, are regularly profiled and seized by police at higher rates, Plaintiff Sinquay Sanders, drove his two younger siblings to McDonalds to protect his frightened sister, despite Aniysha being the registered owner, insurer, and licensed driver of the car. But for the undue and unreasonable pressure upon Black drivers in the City of Grand Rapids, Sinquay Sanders would not have been driving the night of April 6th, 2022, but did so as a shield and protector for his family, who simply wanted to enjoy the American pastime of a random McDonald's meal.   Because of the heightened pressure and risk of seizure,

6

coupled with the recent violent incidents carried out by GRPD, Aniysha Sanders grew increasingly fearful of operating her vehicle and being exposed to Grand Rapids Police Officers.   What she feared would happen on a late night trip to McDonald's, is exactly what she and her family encountered.  When the Plaintiffs were seized in front of their home, Sinquay moved to the back seat to be with his infant sibling, and Aniysha Sanders, registered owner of the vehicle, moved into the driver's seat.  Defendant Officers Lynema and Plasterer noticed the movement in the car before they approached.    Having noticed the officers before he passed them, Sinquay made sure to make complete stops and obey all traffic laws, and as such, the Plaintiffs knew that they had not committed any traffic violations and had done nothing wrong to cause the officers to seize them.  Because they knew they did not violate any traffic rules, but despite that fact were being seized by Grand Rapids Police officers, one of whom had just killed a local resident, they were frightened and defensive when approached by the Defendant officers outside of their home.

(9)

Defendant Officers Lynema and Plasterer questioned the Plaintiffs about the movement in the car after seizure and directed them both to get out of the vehicle.

Both frightened and offended by the seizure without probable cause or actual

viable reasoning, the Plaintiffs refused and directed the officers to call their mother,

Plaintiff Brandy Kimbrel.  A second GRPD car with two officers and a K-9 arrived

in support, just as officers Plasterer and Lynema began to forcibly remove the

Plaintiffs from their vehicle.  Officers Vanvliet and Walton witnessed the Plaintiffs

resisting the orders of Lynema and Plasterer, but were unaware that they had been

seized without cause.  Aniysha Sanders ultimately complied with the officers and

got out of the car, while Sinquay continued to resist in protest of relinquishing his

younger sister to the feared GRPD officers and demanding the wait for his mother.

(10)

At this time, the Officers had the option and discretion to wait for the infant child's

mother while ensuring that Sinquay and Aniysha remained on the scene.  The

Plaintiffs had identified themselves and informed the officers that they were

actually seized in front of their home.  Given the Plaintiffs hysterical state, the

presence of an infant child, and them being seized in front of their home, the

officers could have waited for the child's mother or continued to assure Sinquay

that he and his siblings would be safe.  The Defendants did neither and proceeded

to continue to attempt to forcibly remove Sinquay from the backseat of the vehicle in the presence of the vulnerable infant.

(11)

Plaintiff Sinquay Sanders continued to resist the officers commands, prompting Officer Vanvliet, who brought K-9 Dozer along with him when he exited his patrol car, to release the dog on Sinquay.   In the police incident report, Officer Vanvliet asserts that he gave several warnings to Mr. Sanders that his non-compliance and resistance would cause him to release K-9 Dozer.  Mr. Sanders asserts that he did not notice Dozer nor hear any warnings related to the presence of a police dog before he was bitten and dragged by the K-9.  The Plaintiff's hysteria and phobic reaction to the police was well founded given their aggressive and excessive reputation.  Plaintiffs further assert that they did not roll through any stop signs and obeyed all traffic laws before and after being noticed and pursued by the Defendants.   The Plaintiffs assert that the incident report stating that they were warned about the police dog after they failed to make a proper stop at a stop-sign, was falsified to cover-up their wrongful seizure and consequential injuries.  After being bitten by K-9 Dozer and forcibly removed from the vehicle in the presence of a vulnerable infant, Sinquay and his sister were taken into police custody as

officers waited for Plaintiff Brandy Kimbrel to arrive on the scene.  Because the officers waited for Brandy Kimbrel to arrive, the forcible removal of her children-Plaintiffs was unnecessary, as her presence was the only condition for the terrified youths' compliance with the unwarranted police orders.  The GRPD officers acted in egregious disregard for the life of the minor infant-Plaintiff when they proceeded with a violent seizure during the selective enforcement of an alleged minor traffic violation.

(12)

According to the Defendant's April 2017 "Traffic Stop Data Analysis" study conducted by Lamberth Consulting, Black drivers  are twice as likely to be stopped by Grand Rapids Police Department than white drivers, causing a discriminatory over abundance of police contact with officers who have rarely been held accountable for their abuses.  The Lamberth study also revealed that despite the chances of finding contraband being the same across all races, Black motorists were twice as likely to be searched for contraband after a stop by the Grand Rapids Police Department.  The State of Michigan Department of Civil Rights has over sixty open complaints against the Defendants.  The City of Grand Rapids has long been aware of the open and obvious discriminatory practices by its Police Department against its own minority citizens.  The Plaintiffs endured the pain and

mental suffering of a criminal prosecution and conviction for a crime that was born out of the violation of their constitutional rights.  Charges against Aniysha Sanders were ultimately dismissed, while Sinquay Sanders accepted a plea bargain and probation for driving with a suspended license.  By seizing the Plaintiffs without cause, the Defendants caused them to suffer the discriminatory effect of arrest, charging, prosecution, conviction, and fear of traveling through the land.  The Plaintiffs' right to liberty and to freely travel has been restricted by the City of Grand Rapids' custom of unreasonable seizures of Black Americans.

(13)

Fearing that similar incidents of racial profiling and unlawful seizures would continue, Aniysha Sanders ultimately relinquished her vehicle and stopped driving out of fear of continued encounters with patrol officers in the City of Grand Rapids.  Plaintiff Sinquay Sanders, who had been bitten by a dog as a child, had the trauma triggered and worsened when he was bitten by K-9 Dover.  Plaintiff Brandy Kimbrel has suffered mental anguish and emotional trauma due to the violent encounter between her children and Grand Rapids police officers.  Brandy Kimbrel has been traumatized by the danger her young child was put in by the Defendant's decision to forcibly remove the Plaintiffs after seizing them for allegedly rolling through a stop sign, and then having to endure watching her

children be processed through the criminal justice system.  The ordeal and her reasonable fear of it happening again, has brought on anxiety, loss of sleep, and anger.

(14)

For at least a decade, the City of Grand Rapids, as a municipal corporation, has been officially aware of, complacent with, the constitutional violations of its police department officers.  For several years, the City of Grand Rapids has possessed foreknowledge of its officers' regular practices of seizing Black Americans without cause and using extreme, excessive force against those perceived as minority citizens.  On August 5th of 2020, Governor Gretchen Whitmer signed Executive Directive 2020-9, recognizing racism as a public health crisis and her administrations' steps towards addressing it within state government.  Despite the Defendants' foreknowledge of its constant abuses and the State's public address to the issue, the City of Grand Rapids failed to take significant steps to protect its minority citizens from their violent police force and members.  By failing to act on their foreknowledge of the constitutional and human rights violations being committed by their employees/members against minority citizens, and continuing to empower, fund, support, and arm the officers, the Defendants created a dangerous, disparate, hostile environment, thereby causing the incident giving rise

to suit.   The City of Grand Rapids and its Police department is a federally funded entity, having received over three million dollars in Department of Justice grants for community safety since 2015.   These federal funds have inadvertently been used to sustain unconstitutional customs in Grand Rapids area policing.   Since the 2022 excessive force incidents, and while enjoying judicial protection under the scheme of immunity, the customary racial animus of law enforcement has led to the unnecessary killings of several minorities in Grand Rapids, MI.   In addition to former Grand Rapids Police officer Andrew Schurr, a Kent Sheriff deputy and Michigan State Police officer are also currently facing murder charges for running over and killing minorities in the City of Grand Rapids.   Another Grand Rapids Police officer gunned down an African American man in the midst of a mental health crisis outside of a local hospital, and allowed a K-9 to drag his bleeding body across the street without rendering medical aid.   The gross disregard for life and excessive force regularly exercised by City of Grand Rapids area law enforcement officers against Black American and minority citizens prevents them from freely traveling through the City of Grand Rapids, MI and enjoying all the benefits of life associated with the unencumbered right to move about without fear of unwarranted seizures, and or worse.   Despite being aware of these conditions,

the City of Grand Rapids has only acquiesced to and empowered these racist customs and unconstitutional standards of policing.

(15)

## SPECIFIC ALLEGATIONS AGAINST ALL DEFENDANTS

The City of Grand Rapids, since being made aware of the biases in the implementation of its policing practices, has failed to eradicate the custom of unnecessary violence against Black American and minority citizens.  The City has failed to properly hire unbiased officers and further inadequately trained, educated, reprimanded, and or failed to terminate officers who have shown racial biases and or propensities to participate in unnecessary acts of violence and infringements against the Constitutional rights of citizens.

(16)

Despite being made aware of these customs through the citizenry's consistent filings of complaints against officers, Michigan Department of Civil Rights investigations, and several civil lawsuits, the City of Grand Rapids has defended these acts and allowed there customs to result in several deadly and shocking encounters that have further ingrained the Plaintiff community's fears and prevented them from moving about the land to avoid Police encounters.

(17)

Officers Lynema and Plasterer racially profiled the Plaintiffs when they pursued and seized them solely because they were young African Americans.  Officers Lynema and Plasterer recklessly endangered the life of a young child when they violently removed the Plaintiffs from their vehicle, in front of their home, after a dispute over an alleged stop sign violation that the Plaintiffs maintain did not occur.  Officers Lynema and Plasterer acted out a conspiracy to violate the Plaintiffs rights when they falsified police reports and alleged they failed to stop at a stop sign, and while detained, presented themselves as threats to the Defendants safety.  The Defendants made false allegations against the Plaintiffs to cover-up the wrongful and violent seizure they enacted without viable probable cause.

(18)

Officer Vanvliet acted out of racial animus and excessive-force when he ordered his K-9 partner Dozer to bite the Plaintiff despite being able to remove him from the vehicle without the violent use of his police dog in the presence of an infant. After the unreasonable escalation of an alleged minor traffic violation to a violent seizure,  Officer Vanvliet collaborated with the conspiracy against the Plaintiffs when he falsified documents and exaggerated the level of Mr. Sanders resistance to officers and the danger he presented to himself and his colleagues.

(19)

## COUNT I.  CUSTOMS OF UNREASONABLE SEIZURES – 4th

## Amendment, Sec. 1983

### Defendant – City of Grand Rapids

Plaintiffs reallege paragraphs 1-18.  Defendant City of Grand Rapids created, instituted, and acquiesced to a policing custom of seizing Black residents without probable cause, making travel through the city frightening and unduly burdensome for Black Americans, thereby disparately treating its minority residents and visitors.  By knowingly supporting and ignoring the consistent abridgement of traveling privileges against "Black"/ African Americans citizens through the arming, funding, and empowering of bias police officers who consistently act out of racial prejudices in violation of federal Constitution and the Civil Rights Act of 1964, the Defendant created a hostile and dangerous environment for citizens like these Plaintiffs, and a work environment without accountability for the GRPD and its officers.  But for the Defendants acquiescence to the consistent seizures of minority residents by their police officers without probable cause, these Plaintiffs would not have been injured.  The Defendant City's customs was the moving force behind the Plaintiffs' injuries.

(20)

"The City may be held liable under § 1983 if it maintained a policy or custom that caused the violation of plaintiffs' rights. *See Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.,*455 F.3d 690, 700 (6th Cir.2006). "One way to prove an unlawful policy or custom is to show a policy of inadequate training or supervision." *Id.* (citing *City of Canton v. Harris,*489 U.S. 378, 387, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)). The City can be held liable under plaintiffs' failure-to-train theory if plaintiffs' injuries can be attributed to the City's failure to adequately train Spike *and* this failure amounted to "deliberate indifference" to the rights of members of the public. *See City of Canton,*489 U.S. at 388, 109 S.Ct. 1197. Specifically, plaintiffs must show three elements: (1) that Spike's training was inadequate to prepare him for the tasks he was expected to perform; (2) that the inadequacy persisted due to the City's deliberate indifference; and (3) that the inadequacy is closely related to or actually caused plaintiffs' injuries. *Plinton v. County of Summit,*540 F.3d 459, 464 (6th Cir.2008). *Campbell v. City of Springboro*, 700 F.3d 779, 794 (6th Cir. 2013).  Despite being made aware of these issues through studies and resident complaints, the Defendant is liable for inadequate Supervision as to its officers creating unwarranted contact with citizens and or fabricating probable cause to excuse unreasonable seizures and searches of minority citizens.

(21)

"In *Plinton,* the court identified two ways of demonstrating the second element, deliberate indifference. First, plaintiffs could show deliberate indifference through evidence of prior instances of unconstitutional conduct demonstrating that the City had notice that the training was deficient and likely to cause injury but ignored it. *Id.* (citing *Fisher v. Harden,*398 F.3d 837, 849 (6th Cir.2005)). Alternatively, plaintiffs could show deliberate indifference through evidence of a single violation of federal rights, accompanied by a showing that the City had failed to train its employees to handle recurring situations presenting an obvious potential for such a violation.*Id."* (citing *Bd. of County Comm'rs of Bryan County v. Brown,*520 U.S. 397, 409, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997)). *Campbell v. City of Springboro*, 700 F.3d 779, 794 (6th Cir. 2013).  "'"[d]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." " *Campbell v. City of Springboro*, 700 F.3d 779, 794 (6th Cir. 2013).

(22)

The City Defendant caused these Plaintiffs, and the greater Grand Rapids minority community at large, to suffer under a custom of unconstitutional deprivation of

their liberty to travel on the City's roads unharassed and without unwarranted seizures lacking probable causes, when it failed to address decades of citizen complaints of racial animus and discriminatory treatment.  Despite a research study confirming that Black American drivers were being seized at discriminatory rates and without just causes, the City of Grand Rapids continued empowering, funding, arming, and protecting its biased officers as there offenses worsened, and while failing to seek rectification of the custom, thereby significantly contributing to the harms suffered by Black Americans in the Grand Rapids metro area at the hands of their local Police officers.

(23)

## COUNT II.  CUSTOM OF INTENTIONAL DISCRIMINATION: VIOLATIONS OF TITLES II & VI OF THE 1964 CIVIL RIGHTS ACT "*§ 601 of Title VI, 42 U.S.C. § 2000a, 42 U.S.C. § 2000d, Sec. § 1983*"

### Defendants – City of Grand Rapids

(24)

Plaintiffs, realleges paragraphs 1-22.  The Defendants violated the Plaintiff's constitutional rights to be free from unwarranted seizures and to have access to due process and equal protection under law when they acquiesced to the custom of

their officers regularly and habitually seizing minority residents without probable cause.

(25)

"No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

(26)

"Section 601 of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, prohibits race discrimination in "any program or activity receiving Federal financial assistance." It provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." § 2000d. Title VI, unlike Title VII, "prohibits only intentional discrimination." *Alexander v. Sandoval,* 532 U.S. 275, 280, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001). *Hotchkiss v. Garno*, 883 F. Supp. 2d 719, 737 (E.D. Mich. 2012).

(27)

"All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination on the ground of race, color, religion, or national origin." 42 U.S.C. § 2000a.   For purposes of this section, "commerce" means travel, trade, traffic, commerce, transportation, or communication among the several States, or between the District of Columbia and any State, or between any foreign country or any territory or possession and any State or the District of Columbia, or between points in the same State." 42 U.S.C. § 2000a.  Plaintiffs assert that the public roadways are privileges and advantages of all places of commerce and public accommodations, that the roadways are provided for commerce and travel to the public at large, and that as Black American residents, they have been denied and deterred from full and equal enjoyment of driving on the roads in the City of Grand Rapids, MI, due to the Defendants seizing and assaulting them without probable cause, a known custom in the city.  "*First,* It is well established law that the highways of the state are public property; that their primary and preferred use is for private purposes; and that their use for purposes of gain is special and extraordinary, which, generally at least, the

legislature may prohibit or condition as it sees fit." *Stephenson v. Binford*, 287 U.S. 251, 264 (1932).  "[O]ur decisions identifying public streets and sidewalks as traditional public fora are not accidental invocations of a "cliché." but recognition that wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public. No particularized inquiry into the precise nature of a specific street is necessary; all public streets are held in the public trust and are properly considered public fora." *Satawa v. Board of County Road Comm. of Macomb Co.*, 687 F. Supp. 2d 682, 21 (E.D. Mich. 2009).

(28)

"No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. §  2000d.  The Plaintiffs have been subjected to a discriminatory policing custom of seizing residents without probable cause and fabricating reasoning for the citizen encounters after the wrongful seizures.

(29)

The Defendants denied the Plaintiffs equal enjoyment of the public fora of the City of Grand Rapids by establishing and sustaining a custom of unreasonable seizures

of minority residents on public roads, and  thereby further denying them the public

accommodation of an unbiased, impartial police force in violation of 42 U.S.C. §

2000a, 42 U.S.C. §  2000d, and other federal laws.

(30)

**COUNT III.  FOURTH AMENDMENT VIOLATION – UNREASONABLE**

**SEIZURE: Lack of Reasonable Suspicion and Probable Cause**

**Defendants – City of Grand Rapids, Officers Lynema & Plasterer**

(31)

Plaintiffs, realleges paragraphs 1-29.   The Defendants violated the Fourth

Amendment when they seized the Plaintiffs without reasonable suspicion or

probable cause, and then falsely accused them of running a stop sign to cover-up

their violation.

(32)

"Under core Fourth Amendment principles, the government's seizure of a person

must be "reasonable," U.S. Const. amend. IV, and a seizure that rises to the level of

an arrest must be supported by probable cause." *See Kaupp v. Texas,* 538 U.S. 626,

630, 123 S.Ct. 1843, 1846, 155 L.Ed.2d 814 (2003) ; *Michigan v. DeFillippo,* 443

U.S. 31, 36–37, 99 S.Ct. 2627, 2631–32, 61 L.Ed.2d 343 (1979). *Chesney v. City of*

*Jackson*, 171 F. Supp. 3d 605, 628 (E.D. Mich. 2016).   "The Supreme Court

"repeatedly has explained that 'probable cause' to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *DeFillippo,* 443 U.S. at 37, 99 S.Ct. at 2632. Moreover, "[w]hether an officer is authorized to make an arrest ordinarily depends, in the first instance, on state law." 443 U.S. at 36, 99 S.Ct. at 2631. *Chesney v. City of Jackson*, 171 F. Supp. 3d 605, 628 (E.D. Mich. 2016).  The Plaintiffs were not speeding, did not roll through a stop sign, but made a complete stop; the Plaintiffs had violated no state law before they were detained without reason by the Defendants.

(33)

"First, the right to be free from seizure and prosecution based on fabricated evidence was clearly established at the time of Plaintiff's arrest and prosecution. *See Spurlock v. Satterfield,* 167 F.3d 995, 1006-07 (6th Cir. 1999) ("[A] reasonable police officer would know that fabricating probable cause, thereby effectuating a seizure, would violate a suspect's clearly established Fourth Amendment right to be free from unreasonable seizures . . . . Similarly, a reasonable police officer would be on notice that unlawfully detaining a suspect, despite the fact that the evidence used to detain that individual was fabricated, would also be unlawful.")" *King v.*

*Harwood*, 852 F.3d 568, 582-83 (6th Cir. 2017)." *Tanner v. Walters*, 1:19-cv-849, at *19 (W.D. Mich. Oct. 14, 2022).   "When an officer, without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his business. *Id*., at 498. And any "refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure." *Florida* v. *Bostick*, 501 U.S. 429, 437 (1991). *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000).  After being stopped by officers without cause, Plaintiffs had a right to switch seats because they should not have been seized; they had not acted suspicious or did anything to create the appearance that a crime was afoot.  The Defendants' justification for seeking to arrest the Plaintiffs, i.e. because the driver and passenger switched seats, is fruit of a poisonous tree grown out of their detainment without reasonable suspicion or probable cause.  The Defendants did not have a reasonable suspicion or probable cause because the Plaintiffs did not commit any traffic violations, their car did not have any flaws, nor did they do anything out of the ordinary or indicating that a crime was afoot.  They simply rode past the police doing the speed limit, stopped at two stop signs, and turned towards on their street before being detained in and arrested in front of their home for no reason.

(34)

"a reasonable police officer would know that fabricating probable cause, thereby effectuating a seizure, would violate a suspect's clearly established Fourth Amendment right to be free from unreasonable seizures." *Spurlock*, 167 F.3d at 1006." *Smith v. Cnty. of Wayne*, No. 21-12070, at *33 (E.D. Mich. Dec. 19, 2023). By accusing the Plaintiffs of failing to stop at a stop-sign, the Defendants fabricated probable cause and used it to seize, arrest, and prosecute the Plaintiffs. "The Fourth Amendment, after all, prohibits *all* unreasonable seizures—regardless of whether a prosecution is ever brought or how a prosecution ends. A "Fourth Amendment wrong" "is fully accomplished," *United States v. Calandra,* 414 U.S. 338, 354, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974), when an impermissible seizure occurs. The Amendment is violated and the injury is inflicted no matter what happens in any later proceedings." *Manuel v. City of Joliet*, 137 S. Ct. 911, 925-26 (2017).

(35)

## COUNT IV.  FOURTH AMENDMENT VIOLATION – UNREASONABLE

## SEIZURE: Excessive Force

## Defendants – Officers Plasterer, Lynema, and Vanvliet

(36)

Plaintiffs, realleges paragraphs 1-34.  The Defendants violated the Fourth Amendment when they seized the Plaintiffs with excessive aggression, hostility, and physical force, before deploying a police dog and unnecessarily causing the K-9 to bite the Plaintiff and unreasonably exposing them to danger causing trauma.

(37)

In this circuit, "the reasonableness inquiry in a Fourth Amendment excessive force case is objective. In *Graham v. Connor,* 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), the Supreme Court explained the relevant question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, *without regard to the underlying intent or motivation. . . .* An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional. *Dunigan v. Noble*, 390 F.3d 486, 493 (6th Cir. 2004).

(38)

"Whether an officer's use of force was reasonable turns on the facts of each case. Relevant to the inquiry are (1) the severity of the crime at issue, (2) the immediate

threat the suspect poses to the safety of the officer or others, (3) the suspect's resistance, if any, and (4) the possibility of flight. *Id.* at 396, 109 S.Ct. 1865. The objective reasonableness inquiry is well-established: The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . *Not every push or shove,* even if it may later seem unnecessary in the peace of a judge's chamber, violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation." *Dunigan v. Noble*, 390 F.3d 486, 493 (6th Cir. 2004).  In the facts before this Court, the Defendants knew that they did not have a reasonable suspicion or probable cause of a crime, and the pretextual crime that led to the Plaintiff being bitten by a police dog, was a minor traffic violation that could have been a simple warning or citation.  The Defendants escalated an encounter they had no right to initiate, thereby causing injuries and trauma to the Plaintiffs.

(39)

The Plaintiffs did not present a threat to the officers nor was there any significant crime afoot to reconcile the forceful seizure and deployment of a police dog.  Just as not every push and shove violates the 4th amendment, not every resistance of an Officer's command is illegal, of the same quality, nor necessitates the use of a police dog.  The Defendants violated the Fourth Amendment when they seized the Plaintiffs with excessive aggression, hostility, and physical restraint, before deploying a police dog and unnecessarily causing the K-9 to bite the Plaintiff and unreasonably exposing them to danger causing trauma,

(40)

## COUNT V. CUSTOMS OF FOURTEENTH AMENDMENT VIOLATIONS –

## Custom of Racial Profiling

## Defendant – City of Grand Rapids

(41)

Plaintiffs reallege paragraphs 1-39.  The Defendant established a custom of racial profiling when they became aware of their officers discriminatory tactics and habits of seizing minority residents without cause or justification, but failed to rectify the issue for several decades despite the foreseeable injuries to their residents.

(42)

"We extended this Fourteenth Amendment protection to an officer's decision regarding whom to target for surveillance, explaining that "[c]itizens are cloaked at all times with the right to have the law applied to them in an equal fashion — undeniably, the right not to be exposed to the unfair application of the laws based on their race." *Avery*, 137 F.3d at 353. Just as "all individuals possess the constitutional right to equal protection as they walk through America's airports," so too do individuals possess the right to equal protection as they operate cars on America's thoroughfares. *Id.* at 353-55. An unpublished opinion of this court recognized the application of the Equal Protection Clause to the circumstances now before us: license-plate searches conducted on the basis of race." *U. S. v. Ellison*, 462 F.3d 557, 572 (6th Cir. 2006).  "Police crime-detection activity that does not implicate the Fourth Amendment can violate the Equal Protection Clause of the Fourteenth Amendment if that activity is motivated by race." *U. S. v. Ellison*, 462 F.3d 557, 572 (6th Cir. 2006).

(43)

""[o]ften it is difficult to prove directly the invidious use of race," and thus "`an invidious discriminatory purpose may often be inferred from the totality of the relevant facts. . . .'" *U. S. v. Ellison*, 462 F.3d 557, 572 (6th Cir. 2006).  The

Defendants began following the Plaintiffs after seeing them ride past them and seized them without seeing a crime being committed or any reason to believe one was about to occur.  The Plaintiffs assert that they were in fear of being seized without cause when they left and fell victim to the reality of the Defendants unconstitutional custom of seizing minorities without justification and asserting false accusations against them to cover-up their wrongful seizures.

(44)

The Defendant acquiesced to a custom of racial profiling when they became aware of their officers discriminatory tactics and habits of seizing minority residents without cause or justification and then covering it up with false accusations, but failed to rectify the issue for several decades despite the foreseeable injuries to their residents and the enhanced emboldenment of their police officers.

(45)

## COUNT VI. RACIAL PROFILING

### Defendants – City of Grand Rapids, Officers Plasterer and Lynema

(46)

Plaintiffs, realleges paragraphs 1-45.  The Defendants committed racial profiling when they followed the Plaintiffs after noticing their race and seized them without a reasonable suspicion, probable cause, or seeing a crime being committed.

(47)

"Particular attention should be paid to racial profiling claims where, as here under the majority's view, the police's discretion is unconstrained by a heightened suspicion requirement to target a driver" *U. S. v. Ellison*, 462 F.3d 557, 573 (6th Cir. 2006)  "Such unbounded discretion carries with it grave potential for abuse. The majority takes comfort in the lack of evidence of "an epidemic of unnecessary minor-offense arrests." *Ante*, at 33, and n. 25. But the relatively small number of published cases dealing with such arrests proves little and should provide little solace. Indeed, as the recent debate over racial profiling demonstrates all too clearly, a relatively minor traffic infraction may often serve as an excuse for stopping and harassing an individual." *Atwater v. City of Lago Vista*, 532 U.S. 318, 372 (2001)(Dissent).

(48)

The Sixth Circuit has clarified that "we know from our experience that more often than not people do not act in a totally arbitrary manner, without any underlying

reasons," and thus, after a prima facie case of discrimination has been made, "when all legitimate reasons for [a given action] have been eliminated as possible reasons for the [action], it is more likely than not the [decisionmaker], who we generally assume acts only with *some* reason, based his decision on an impermissible consideration such as race" *U. S. v. Ellison*, 462 F.3d 557, 574 (6th Cir. 2006). Plaintiffs assert that the Defendants were determined to pursue them after seeing their race and that they were seized for no reason. The Plaintiffs maintain that they did not roll through a stop sign and followed all traffic laws properly because they perceived the officers intentions and took precautions to not give them a valid reason to seize them.

(49)

The Defendants committed racial profiling when they followed the Plaintiffs after noticing their race and seized them without a reasonable suspicion, probable cause, or seeing a crime being committed.

(50)

**COUNT VII. SELECTIVE ENFORCEMENT – Equal Protection Violation**

**Defendants: City of Grand Rapids, Officers Plasterer & Lynema**

(51)

Plaintiffs, realleges paragraphs 1-49.  The Defendants violated the equal protection clause of the Constitution when they seized, forcibly arrested, and initiated prosecutions against the Plaintiffs for a fabricated, minor traffic violation.

(52)

"The Equal Protection Clause of the Fourteenth Amendment provides citizens a degree of protection independent of the Fourth Amendment protection against unreasonable searches and seizures."" *Hill v. City of Southfield*, No. 09-cv-12373, at *6-7 (E.D. Mich. Nov. 22, 2010).  Furthermore, "selective enforcement can lead to section 1983 liability if the plaintiff can show purposeful discrimination. The presence of probable cause does not bar an equal protection claim." *Hill v. City of Southfield*, No. 09-cv-12373, at *6 (E.D. Mich. Nov. 22, 2010).

(53)

"To establish a claim of selective enforcement based on race, the plaintiff must show 1) a government official singled the plaintiff out as belonging to a certain race for arrest even though the same government official decided not to arrest other similarly-situated persons not belonging to the plaintiff's race; 2) the official initiated the arrest with a discriminatory purpose in mind; and 3) the arrest had a discriminatory effect upon the racial group to which the plaintiff belongs." *Hill v.*

*City of Southfield*, No. 09-cv-12373, at *7 (E.D. Mich. Nov. 22, 2010). "To satisfy the first and third elements of a selective enforcement claim, a plaintiff must make a prima facie showing that similarly-situated persons outside his race were not arrested. *Gardenhire*, 205 F.3d at 319. He can do so by naming a similarly situated individual who was not investigated, or through the use of statistical or other evidence. *Farm Labor Organizing Comm. v. Ohio State Highway*, 308 F.3d 523, 534 (6th Cir. 2002). There is a strong presumption that officers have properly discharged their duties, and a plaintiff must come forward with clear evidence to the contrary in order to rebut this presumption. *Gardenhire*, 205 F.3d at 319. The standard is demanding. *Id." Hill v. City of Southfield*, No. 09-cv-12373, at *7 (E.D. Mich. Nov. 22, 2010). The Plaintiffs assert that the Defendants were focused on another citizen who they relinquished pursuing when they noticed their race. The Plaintiffs also submit Exhibit A as statistical evidence of the Defendants selective enforcement.

(54)

## COUNT VIII. CONSPIRACY TO VIOLATE CIVIL RIGHTS – Sec. 1983, Sec. 1985(3), Sec. 1981(c), Sec. 1986

**Defendants – City of Grand Rapids, Officers Plasterer & Lynema**

(55)

Plaintiffs reallege paragraphs 1-53.  The Defendants acted out a conspiracy to violate civil rights of the Plaintiffs when they agreed to falsify official documents to state that the Plaintiffs committed a traffic violation that justified their seizure and use of force.  The Defendant City of Grand Rapids, through its foreknowledge of the discriminatory tactics of its police officers, was aware of these kinds of violations and their frequency of occurrence, but failed to take adequate measures to rectify the custom of unjustified seizures and fabricated allegations against residents to cover them up.

(56)

"All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981(a). "The rights protected by this section

are protected against impairment by nongovernmental discrimination and impairment under color of State law." 42 U.S.C. § 1981(c).  "If two or more persons in any State or Territory conspire…"for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws…if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators." 42 U.S.C. § 1985 (3).

(57)

"Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act." 42 U.S.C. § 1986.

(58)

"A civil conspiracy is an agreement between two or more persons to injure another by unlawful action." *Moore v. City of Paducah,* 890 F.2d 831, 834 (6th Cir. 1989); *Hooks v. Hooks,* 771 F.2d 935, 943-944 (6th Cir. 1985). In order to state a claim of civil conspiracy under § 1983, a plaintiff must show that there was a single plan, that the coconspirators shared in the objective of the conspiracy, violating the plaintiff's constitutional rights, and that an overt act was committed in furtherance of the conspiracy. *Moore,* 890 F.2d at 834; *Hooks,* 771 F.2d at 943-944. *Matthews v. McQuiggin,* No. 2:10-cv-145, at *13 (W.D. Mich. Aug. 29, 2011).   The Defendants shared the single plan and objective of justifying their seizure of the Plaintiffs.   They took overt acts in furtherance of covering up their fourth amendment violation by fabricating incident reports by stating that they saw the Plaintiffs roll through a stop sign and they knew that was false and the Plaintiffs did not commit any traffic violations in front of them.

(59)

"The elements of a conspiracy claim under 42 U.S.C. § 1985(3) do not merely require that an agreement be made for the purpose of depriving someone's constitutional rights. Rather, the conspiracy must exist for the purpose of depriving

a person or class of persons of equal protection of the law. *See Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 314 (6th Cir. 2005)." *Hanas v. Inner City Christian Outreach, Inc.*, 542 F. Supp. 2d 683, 695 (E.D. Mich. 2008).  The Defendants acted out their conspiracy to deprive the Plaintiffs of their right to travel on the roads unmolested and equally as all other similarly situated citizens.  The City of Grand Rapids, through its foreknowledge from independent studies and resident complaints, should have taken measures to prevent its officers from violating the civil rights of its residents.

(60)

**COUNT IX. VIOLATION OF RIGHT TO TRAVEL – Due Process Violation**

**Defendants – City of Grand Rapids, Officers Plasterer & Lynema**

(61)

Plaintiffs reallege paragraphs 1- 59.  The Defendants subjected the Plaintiffs to unreasonable restraints on their mobility and ability to travel through the city when, without cause, they seized them, forcibly arrested them, and initiated prosecutions based on a fabricated version of the incident.  The Defendants seized and stopped the Plaintiffs from traveling unmolested from a commercial area solely

because the Plaintiffs were young, Black American, and riding in a nice looking car.

(62)

"The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." U.S. Const. art. IV, § 2.  "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV.  "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV.

(63)

"The right to travel interstate is a basic, fundamental right under the Constitution, its origins premised upon a variety of constitutional provisions." *Bergman v. United States*, 565 F. Supp. 1353, 1397 (W.D. Mich. 1983).  "The right to travel is a fundamental constitutional right: [F]reedom to travel throughout the United States has long been recognized as a basic right under the Constitution. . . . The

right to travel is an "unconditional personal right," a right whose exercise may not be conditioned." *Grace v. City of Detroit*, 760 F. Supp. 646, 649 (E.D. Mich. 1991). ""The right to move freely about one's own neighborhood or town" is a fundamental liberty interest protected by the Due Process Clause" *Johnson v. City of Cincinnati*, 310 F.3d 484, 496 (6th Cir. 2002).

(64)

"As early as the Articles of Confederation, state citizens "possessed the fundamental right, inherent in citizens of all free governments, peacefully to dwell within the limits of their respective states, to move at will from place to place therein, and to have free ingress thereto and egress therefrom." *United States v. Wheeler,* 254 U.S. 281, 293, 41 S.Ct. 133, 65 L.E. 270 (1920). As Chief Justice Taney observed: For all the great purposes for which the Federal government was formed, we are one people, with one common country. We are all citizens of the United States; and as members of the same community, must have the right to pass and repass through every part of it without interruption, *as freely as in our own States." Johnson v. City of Cincinnati*, 310 F.3d 484, 497 (6th Cir. 2002). "Or as the Supreme Court noted at the turn of the twentieth century: "[T]he right to remove from one place to another according to inclination, is an attribute of . . .

liberty . . . secured by the Fourteenth Amendment and by other provisions of the Constitution." *Williams v. Fears,* 179 U.S. 270, 274, 21 S.Ct. 128, 45 L.Ed. 186 (1900). More recently, Justice Stevens, joined by Justice Souter and Justice Ginsburg, observed: [I]t is apparent that an individual's decision to remain in a public place of his choice is as much a part of his liberty as the freedom of movement inside frontiers that is "a part of our heritage" *Kent v. Dulles,* 357 U.S. 116, 126, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958), or the right to move "to whatsoever place one's own inclination may direct" identified in Blackstone's Commentaries. 1 W. Blackstone, Commentaries on the Laws of England 130 (1765). *Johnson v. City of Cincinnati*, 310 F.3d 484, 497 (6th Cir. 2002).

(65)

"Clearly, the deprivation of the right to equal protection and to travel freely interstate falls within the category of injuries contemplated by § 1986. *See, Bergman v. United States, supra,*565 F. Supp. at 1394-95. In fact, in discussing the nature of the negligence cause of action in that opinion, this Court specifically found that "the government's negligence lies in its failure to intercede to protect Plaintiffs' right to interstate travel and to equal protection of the law." *Id.* at 1411. It

would be incongruous to now ignore those injuries in assessing damages."
*Bergman v. United States*, 579 F. Supp. 911, 934-35 (W.D. Mich. 1984).

(66)

The Defendants subjected the Plaintiffs to their customs of seizing minority travelers without probable cause and racial animus when they created and escalated the encounter by seizing the Plaintiffs without cause and forcibly removing them violently for a fabricated minor traffic violation.

(67)

**DAMAGES**

Plaintiffs, realleges paragraphs 1-66.

(68)

A "jury may be permitted to assess punitive damages in an action under § 1983 when a defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to federally-protected rights of others and such threshold applies even when the underlying standard of liability for compensatory damages is one of recklessness. 42 U.S.C.A. § 1983. Smith v. Wade, 461 U.S. 30, 103 S. Ct. 1625, 75 L. Ed. 2d 632 (1983).   The calculation of future damages for types of future damages described in subsection (1)(b) shall be based

on the costs and losses during the period of time the plaintiff will sustain those costs and losses. M.C.L. § 600.6305

(69)

**RELIEF REQUESTED**

Plaintiff, realleges paragraphs 1-68

(70)

As a result of the aforementioned legal violations suffered by the Plaintiffs and caused by the Defendants, this Plaintiff family is enduring loss of enjoyment of life and post traumatic stress disorder symptoms manifested in mental anguish, humiliation, outrage, and emotional distress.

(71)

**Wherefore**, the Plaintiff respectfully requests that this Honorable Court enter a Judgment in her favor against Defendants for the following relief:

I.   That $500,000.00 be paid in compensatory and exemplary damages to the Plaintiffs to compensate them for the mental and physical anguish, loss of enjoyment, and the post traumatic stress they will continue to endure;

II.  That $100,000.00 be paid as an award of interest, costs, and reasonable attorney fees;

III.    That equitable relief in the form of an order mandating racial profiling and animus training, conducted by firms provided by the Plaintiff, for all Defendants; including Grand Rapids Police officers, city employees, and elected officials, so as to address the public health crisis of racism in the City of Grand Rapids government and public institutions.

IV.    Any other compensatory, exemplary, or equitable relief that this Honorable Court deems appropriate at the commencement of trial.

**THE J.R. BEASON FIRM, PLLC.**
Attorney John R. Beason III
For the Plaintiffs

Dated: January 26th, 2025

By:  /s/ John R. Beason III, Esq.
The J.R. Beason Firm PLLC.
D.C. Bar No.: 1721583
IBA Bar No.: 1522438
853 McAlister Ave.
Benton Harbor, MI 49022
(269) 213-1426
JRBeason3@TheJRBeasonFirm.com

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

_____

BRANDY KIMBREL, Individually
and as Next Friend for A.M.;
SINQUAY SANDERS, Individually; and
ANIYSHA SANDERS, Individually;

     Plaintiffs.                                                    Case No.:

v.                                                                         Hon. Judge Hala Y. Jarbou

CITY OF GRAND RAPIDS;
OFFICER AUSTIN LYNEMA, Individually
and in his official capacity; OFFICER
BRANDON PLASTERER, Individually
and in his official capacity; OFFICER
THEODORE VANVLIET, Individually
and in his official capacity.

Defendants.

_____

## **JURY DEMAND**

To the extent that a jury trial is allowed with regard to any of the issues as set forth above, Plaintiff mercifully demands such.

**THE J.R. BEASON FIRM, PLLC.**
Attorney John R. Beason III

46

For the Plaintiffs

Dated: January 26th, 2025

By: /s/ John R. Beason III, Esq.
Attorney John R. Beason III
D.C. Bar No.: 1721583
IBA Bar No.: 1522438
853 McAlister Ave.
Benton Harbor, MI 49022
(269) 213-1426
JRBeason3@TheJRBeasonFirm.com